UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

RONALD DE'ERIC KIRKLAND,

     Petitioner,

v.                                Case No. 3:16cv482-LC-HTC

SECRETARY, FLORIDA
 DEPARTMENT OF CORRECTIONS,

     Respondent.
_____/

## REPORT AND RECOMMENDATION

Petitioner, Ronald De'Eric Kirkland filed a petition under 28 U.S.C. § 2254 challenging a 40-year sentence for convictions of Attempted Second-Degree Murder with a Weapon; Attempted Felony Murder with a Weapon; Shooting into an Occupied Vehicle; and Armed Robbery with a Firearm.[1]  ECF Doc. 1.  The matter was referred to the undersigned Magistrate Judge for preliminary screening and report and recommendation pursuant to 28 U.S.C. § 636 and N.D. Fla. Loc. R. 72.2(B).  After considering the petition, the State's response (ECF Doc. 47), and Kirkland's reply (ECF Doc. 56), the undersigned recommends the petition be DENIED without an evidentiary hearing.

_____

[1] Petitioner filed the petition *pro se*, but counsel Michael Robert Ufferman appeared for Petitioner in September 2020.  ECF Doc. 39.

## I.   BACKGROUND

Petitioner, who was fifteen years old at the time, ECF Doc. 47-5 at 4, was arrested and charged with Attempted Second-Degree Murder with a Weapon; Attempted Felony Murder with a Weapon; Shooting into an Occupied Vehicle; and Armed Robbery with a Firearm, all involving the shooting of a pizza delivery driver on April 26, 2008.  ECF Doc. 47-1 at 26.  Petitioner went to trial in February 2009 after the driver, who survived the shooting, identified him as the shooter out of a photo lineup.

The driver testified as follows at trial.  On April 26, 2008, he was assigned to deliver a pizza to an address on Sonny Boy Lane in Pensacola, Florida.  ECF Doc. 47-3 at 99.  As he arrived near the address, two males flagged him down and said they had ordered the pizza.  *Id.* at 101.  The driver pulled into a driveway, turned off the car, got out, and placed the pizza on top of the vehicle.  The two males were five feet from the driver, and he had "a clear view of these individuals", *id.* at 105, although he had never seen them before.  *Id.* at 106.

After he told the two the price, around $44, they stated they did not have enough money.  *Id.* at 104.  The driver responded that he would return the pizza to the store, and they could pick up the pizza when they had the money.  *Id.* at 106.  At that point, one of the males pulled out a silver, long-barreled gun, aimed it at the driver and demanded the pizza and money.  *Id.* at 106.  At the same time, several other men started

to come out from the sides of the home. *Id.* The driver testified that he was focused on the shooter and his face from that point on during the encounter. *Id.* at 107.

When the driver told the male holding the gun that he had no money, the person said, "That's bullshit." The driver then started going to his car and opened the door. Someone behind the driver then hit him in the back of the head, and the driver landed in the seat. He closed and locked the door and tried to start the car, but it misfired. The gun-holding male tapped the gun on the window as the car finally started up. *Id.* at 109-10.

After he tapped the gun on the window, the perpetrator shot the gun and blew out the driver's side window. *Id.* at 110. The driver had trouble getting the car in gear but eventually put it in reverse and sped away, while he was being shot at through the windshield and from behind. *Id.* After a few moments he realized he had been hit but managed to drive back to the pizza business, where he walked in the door and collapsed. *Id.* at 34. He was taken to the hospital where he learned his injuries. He testified, "I got shot in my hand . . . I got my finger tipped off. I got shot right here by the temple and in my neck." *Id.* at 114. He was permanently blinded in his right eye. *Id.* at 115.

Investigator Guy from the Escambia County Sheriff's Office testified he went to the driver's hospital room the next morning and showed the driver three different photographic line-ups of six individuals each. *Id.* at 134. The driver had no problems seeing out of his left eye and was able to understand everything the investigator was

asking him. *Id.* The investigator showed the driver the photo array and asked if there were any individuals that he might recognize; the investigator did not state that a suspect was necessarily in the array. *Id.* at 136. The driver "immediately" identified No. 2 – the Petitioner – as the shooter. *Id.* He was shown other photographic line-ups containing others suspected to be involved but was not able to identify anyone in those lineups. *Id.* at 139-40.

The driver's testimony about the identification matched the investigator's testimony. The driver testified that, prior to the eye injury, his vision was fine and that he told police he could "100 percent" identify the shooter if he saw him again. *Id.* at 116. He stated that in his hospital room he was eventually shown a photographic lineup of three pages, *id.* at 118, was able to pick out the shooter in "five to seven seconds", *id.* at 119, and was "positive" when he identified the shooter's picture. *Id.* He also identified Petitioner as the shooter in open court.

During cross-examination, the driver testified no money was taken from him during the robbery and he had originally described the shooter to the police as "about 5'6" tall and as a black male with "dark skin." *Id.* at 126-27. During the re-direct examination, the court had Petitioner stand, and the driver stated that his height in court was consistent with what he told police, as was his skin tone. *Id.* at 130-31. He had "no doubt" in his mind Petitioner was the person who had shot him. *Id.* at 131.

Also, during the trial, a teacher from Petitioner's school testified about the following admission made by Petitioner in class:

A.     Well, Mr. Kirkland was discussing, he came into class with more than five dollars in money and A.V, Clubbs Middle School has this policy that no student is allowed to have more than five dollars on them at any given time.

So when I asked him about the money that he had, he simply started talking to the other students in the back of the classroom about the fact that, how he had received the money and what the money was from.

Q.     Okay. What did he say about the money itself?

A.     The money he said was this money is from the robbery of a pizza person.

Q.     Okay, and did he say anything about the shooting?

A.     Yes, we shot that B and this is part of the money.

ECF Doc. 47-3 at 89.

Petitioner, who was sixteen at the time of trial, testified.  He testified he was with his friends Roderick McKinnon, Montrel Collins and Nathaniel Peters-Wade that evening.  *Id.* at 152-53.  He stated that, as the three were walking down Sonny Boy Lane at around 7-7:30 p.m., they decided to order a pizza, and Montrel used his cellphone to order one for delivery.  Petitioner testified he, Roderick and Nathaniel had money, but Montrel did not, so Montrel rode home on a bicycle to get money.  *Id.* at 155.  Petitioner, Roderick, and Nathaniel waited for 10 or 15 minutes and then headed back to Petitioner's house several blocks away.  On the way there, they saw Montrel coming back on his bicycle, "started hearing shots", and ran to Petitioner's house because they were scared.  *Id.* at 156.  Petitioner testified he was wearing a yellow shirt and yellow plaid pants that night and that he was 5'2" to 5'3" tall.  *Id.* at 156.  He testified he did not know where the pizza was supposed to be delivered to and never saw the pizza delivery driver arrive.  *Id.* at 156-57.  Petitioner also denied making a statement at school about shooting or robbing a pizza delivery driver.  *Id.* at 159.

On cross-examination, the prosecutor established that Petitioner had agreed to be interviewed during the investigation by Investigator Guy. *Id.* at 163. During the interview, Petitioner contradicted his testimony at trial and had told the investigator that "Montrel went to the house to get his money because everybody else [was] out of money." *Id.* at 164. During cross-examination, Petitioner denied making that statement to Investigator Guy. *Id.* The defense rested after Petitioner's testimony, and the State recalled Investigator Guy, who testified he had interviewed Petitioner on April 28, 2008, and Petitioner <u>had</u> stated during the interview that "none of them had any money. That one of the other kids had gone home to try to get some." *Id.* at 172.

Petitioner was found guilty on February 11, 2009 and was sentenced on May 22, 2009 to a 40-year total sentence, with a 25-year mandatory minimum. *Id.* at 95-96. On May 6, 2010, Petitioner filed a Rule 3.800(b)(2) motion to correct sentence, ECF Doc. 47-5 at 4, which the state court granted on June 18, 2010, *id.* at 45, and resentenced Petitioner to the same sentence on June 28, 2010. *Id.* at 49.

### B.    Postconviction History and Timeliness

Petitioner filed a direct appeal of his judgment and conviction to the First District Court of Appeals (the "First DCA"). Case No, 1D09-3325. The First DCA issued a written opinion on August 4, 2011, reversing the conviction on Count 1, the lesser included offense of second-degree murder, and affirming the convictions on Counts 2-4. ECF Doc. 47-9 at 21. Both sides petitioned the Florida Supreme Court for discretionary review, but the Florida Supreme Court declined to accept jurisdiction on

either petition, on January 24, 2014 (on the State's petition) and February 28, 2014 (on the Petitioner's petition).  ECF Doc.  47-20.

On July 2, 2014 (65 days later), Petitioner filed a *pro se* Rule 3.800(c) motion to mitigate sentence.  ECF Doc. 47-21 at 2.  The state court denied the motion on July 29, 2014.  *Id.* at 19.

On March 17, 2015 (after another 231 days, for a total of 296 days), Petitioner filed a *pro se* Rule 3.850 motion, ECF Doc. 47-22 at 17, 34, which he amended on April 27, 2015, *id.* at 60, and again on December 4, 2015, *id.* at 77, 101.  The motion was denied on January 21, 2016, *id.* at 103, and a motion for rehearing was denied on March 15, 2016, *id.* at 208.  Petitioner filed an appeal and the First DCA affirmed *per curiam* without a written opinion.  Case No.: 1D16-1591.  The First DCA issued on July 26, 2016.  ECF Doc. 47-23 at 2.

Petitioner filed the instant federal petition by on September 22, 2016 (after another 58 days passed, for a total of 354 days).  ECF Doc. 1 at 27.  The petition is therefore timely filed.  *See* 28 U.S.C. 2244(d)(1).

After filing the petition, however, on April 25, 2017, Petitioner filed a Rule 3.800(a) motion to correct illegal sentence under *Graham v. Florida*, 560 U.S. 48 (2010), which was issued during the pendency of Petitioner's direct appeal.  ECF Doc. 47-24 at 17.  As a result of that filing, the Respondent moved to stay this case pending resolution of that motion, which the Court granted.  ECF Docs. 18, 20.  The circuit court denied the motion on September 5, 2018, *id.* at 90, and denied a motion for

rehearing, *id.* at 115, on October 1, 2018. *Id.* at 130. Petitioner appealed and the First

DCA affirmed. Case No.: 1D18-4684. The mandate was issued July 16, 2019.

Petitioner petitioned the Supreme Court to invoke discretionary jurisdiction,

which it did on December 11, 2020, quashing the First DCA's decision and remanding

the matter to the First DCA to consider the application of *Pedroza v. State*, 291 So. 3d

541 (Fla. 2020) to Petitioner's appeal. ECF Doc. 47-30. On remand, the First DCA

applied *Pedroza* and again affirmed the Petitioner's sentence, in a written opinion dated

March 17, 2021. The court issued its mandate April 14, 2021. ECF Doc. 47-32. The

Florida Supreme Court declined to accept jurisdiction and issued an order denying

Petitioner's petition for discretionary jurisdiction on July 19, 2021. ECF Doc. 47-37

at 17. Because the motion to correct illegal sentence is now fully resolved, this petition

is now ripe for consideration.

## II.    LEGAL STANDARDS

### A.    The Antiterrorism Effective Death Penalty Act ("AEDPA")

The AEDPA governs a state prisoner's petition for habeas corpus relief. 28

U.S.C. § 2254. Under that act, relief may only be granted on a claim adjudicated on

the merits in state court if the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). This standard is both mandatory and difficult to meet. *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014). A state court's violation of state law is not enough to show that a petitioner is in custody in violation of the "Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *Wilson v. Corcoran*, 562 U.S. 1, 16 (2010).

"Clearly established federal law" consists of the governing legal principles set forth in the decisions of the United States Supreme Court when the state court issued its decision. *White*, 134 S. Ct. at 1702; *Casey v. Musladin*, 549 U.S. 70, 74 (2006) (citing *Williams v. Taylor*, 529 U.S. 362, 412 (2000)). Habeas relief is appropriate only if the state court decision was "contrary to, or an unreasonable application of," that federal law. 28 U.S.C. § 2254(d)(1). A decision is "contrary to" clearly established federal law if the state court either: (1) applied a rule that contradicts the governing law set forth by Supreme Court case law; or (2) reached a different result from the Supreme Court when faced with materially indistinguishable facts. *Ward v. Hall*, 592 F.3d 1144, 1155 (11th Cir. 2010); *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003).

A state court decision involves an "unreasonable application" of Supreme Court precedent if the state court correctly identifies the governing legal principle, but applies it to the facts of the petitioner's case in an objectively unreasonable manner, *Brown v. Payton*, 544 U.S. 133, 134 (2005); *Bottoson v. Moore*, 234 F.3d 526, 531 (11th Cir. 2000), or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to

extend that principle to a new context where it should apply." *Bottoson*, 234 F.3d at

531 (quoting *Williams*, 529 U.S. at 406). "A state court's determination that a claim

lacks merit precludes federal habeas relief so long as fair-minded jurists could disagree

on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86,

101 (2011). "[T]his standard is difficult to meet because it was meant to be." *Sexton v.*

*Beaudreaux*, 138 S. Ct. 2555, 2558 (2018).

Also, "[w]hen a federal claim has been presented to a state court and the state

court has denied relief, it may be presumed that the state court adjudicated the claim

on the merits in the absence of any indication or state-law procedural principles to the

contrary." *Harrington*, 562 U.S. at 99. Therefore, the denial of the claim by the state

court is entitled to the deference. *Id.*

Finally, when reviewing a claim under 28 U.S.C. § 2254(d), a federal court must

remember that any "determination of a factual issue made by a State court shall be

presumed to be correct[,]" and the petitioner bears "the burden of rebutting the

presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1);

*Burt v. Titlow*, 134 S. Ct. 10, 15 (2013) ("[A] state-court factual determination is not

unreasonable merely because the federal habeas court would have reached a different

conclusion in the first instance.").

## B.    Ineffective Assistance of Trial Counsel ("IATC") Claims

Three of the four grounds for relief Petitioner raises are for IATC. An IATC

claim requires a showing that (1) counsel's performance during representation fell

below an objective standard of reasonableness, and (2) prejudice resulted, *i.e.*, that a reasonable probability exists that but for counsel's unprofessional conduct, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 689 (1984). The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential. *Id.* at 689. The defendant bears the burden of proving that counsel's performance was unreasonable under prevailing professional norms and that the challenged action was not sound strategy. *Id.* at 688-89.

*Strickland*'s prejudice prong requires a petitioner to allege more than simply that counsel's conduct might have had "some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. The petitioner must show a reasonable probability exists that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Bare allegations the petitioner was prejudiced by counsel's performance are not enough. *Smith v. White*, 815 F.2d 1401, 1406-07 (11th Cir. 1987).

## III.  ANALYSIS

Petitioner exhausted Grounds One, Two, and Three grounds by raising them in his second amended 3.850 motion. Because the First DCA upheld the state court ruling without written opinion, this Court will "look through" the unexplained decision of the First DCA to the circuit court's explanation -- the last related state-court decision that

does provide a relevant rationale.  It should then presume that the unexplained decision adopted the same reasoning and apply the deference due under § 2254(d).  *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

Petitioner exhausted Ground Four by raising it in the 3.800 motion, which the First DCA affirmed with a written opinion.

In reviewing the state court's rationales and applying the standards above, the undersigned recommends Petitioner is not entitled to relief on any of the grounds raised.

### A.    Ground One: IATC for Failing to Move to Suppress Petitioner's Pre-Trial Statement Based on a Violation of *Miranda*

Petitioner argues his counsel was deficient under *Strickland* because he should have moved to suppress Petitioner's pretrial statement to Investigator Guy.  Petitioner claims counsel should have known that Petitioner's purported waiver of his rights before the interview was not knowing, intelligent, or voluntary.  ECF Doc. 1 at 5-6. Petitioner argues he could not have made a knowing, intelligent, or voluntary waiver because (1) he was a 15-year-old teenager living with his grandmother who was his legal guardian; (2) he was on Adderall, a psychotropic medication prescribed to him due to intellectual and hyperactivity defects; and (3) he did not understand either the nature of the rights being abandoned or the consequences of the decision to abandon those rights.

Petitioner argues he was prejudiced under *Strickland* because suppression of Petitioner's initial statements to Investigator Gay would have effectively prohibited the

State from impeaching Petitioner with prior inconsistent statements regarding whether he or any of his friends had any money in their possession at the time of the offense. If the State could not have impeached Petitioner by introducing his prior statements, the jury would have given more weight to the credibility and truthfulness of Petitioner's testimony.  Also, the statement during the interview that none of the boys had any money provided a motive for the robbery.

In the state court's January 21, 2016, order denying Petitioner's second amended 3850 motion, the court applied *Strickland* and denied this claim because "the record conclusively demonstrates that the Defendant was not prejudiced within the meaning of *Strickland* by this omission."  Namely, regardless of whether the statement was admissible in the State's case-in-chief, "the statement may be admissible as a prior inconsistent statement and used by the state for impeachment purposes."  ECF Doc. 47-22 at 109-110 (internal citations to the record omitted).  Also, the victim clearly identified Petitioner as the shooter.  Thus, a motion to suppress, even if granted, would not have changed the outcome of the trial.  *Id.*

While the state court is correct that a statement excluded based on *Miranda* may be used to impeach, the State still must show the statement was voluntarily made.  *See Carlisi v. State*, 831 So. 2d 813, 815 (Fla. Dist. Ct. App. 2002), citing *Nowlin v. State,* 346 So.2d 1020, 1024 (Fla.1977).  Therefore, the undersigned disagrees that the State's potential ability to use the statement necessarily prevents Petitioner from showing he was prejudiced by counsel's failure to move to suppress.  However, the state court was

correct in determining Petitioner could not show the outcome of the trial would be different in light of the other evidence presented.[2]

The victim positively identified Petitioner as the gunman, both in a photographic line-up during the investigation and in open court. The victim told the jury how he had focused on the shooter's face, ECF Doc. 47-3 at 107; that he was "100 percent" sure he could identify the shooter, *id.* at 116; that he was "positive" it was shooter when he identified him in the photo array, *id.* at 119; and that he had "no doubt" when seeing the Petitioner in court that he was the person who shot him, *id.* at 131. In addition, the State presented testimony that Petitioner, in front of his classmates, boasted about robbing a pizza person and said, "we shot that bitch." *Id.* at 89-90.

Thus, Petitioner has not shown "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Since Petitioner cannot meet the prejudice prong, it is irrelevant whether counsel's performance was deficient. *Holladay v. Haley*, 209 F.3d 1243, 1248 (11th Cir. 2000) ("Because both parts of the [Strickland] test must be satisfied in order to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong, or vice versa."); *see also Osley v. United States*, 751 F.3d 1214, 1222 (11th Cir. 2014)

---

[2] Petitioner argues in the reply that regardless of whether the statement might have been used to impeach, had the motion been made and granted pretrial, Petitioner may not have testified, thus precluding the need for impeachment evidence. Because the undersigned finds Petitioner cannot show the outcome of the trial would be different, that argument does not turn the tide.

("A habeas petitioner claiming ineffective assistance of counsel must carry his burden on both *Strickland* prongs, and a court need not address both prongs if the defendant has made an insufficient showing on one."); *Johnson v. Alabama*, 256 F.3d 1156, 1176 (11th Cir. 2001) ("The petitioner bears the burden of proof on the 'performance' prong as well as the 'prejudice' prong of a Strickland claim, and both prongs must be proved to prevail."). Petitioner is not entitled to habeas relief on this claim.

### B.    Ground Two: IATC for Failing to Move for Judgment of Acquittal on the Attempted First-Degree Felony Murder and Robbery with a Firearm Counts Based on Double Jeopardy

Petitioner argues his conviction constitutes double jeopardy because the shooting of the driver was an element of felony murder and robbery. ECF Doc. 1 at 10-13. Thus, Petitioner argues counsel was deficient for failing to move for a judgment of acquittal.

In the state court's January 21, 2016, order denying Petitioner's second amended 3850 motion, the state court applied *Strickland* and denied this claim because "dual convictions do not constitute a double jeopardy violation." ECF Doc. 47-22 at 108. Thus, "[t]rial counsel cannot be deemed ineffective for failing to raise meritless claims or claims that had no reasonable probability of affecting the outcome of the proceeding." *Id.*

"The Double Jeopardy Clause of the Fifth Amendment provides that no person shall 'be subject for the same offence to be twice put in jeopardy of life or limb.'" *Justices of Boston Mun. Court v. Lydon*, 466 U.S. 294, 306 (1984). This guarantee is

applicable to the states through the Fourteenth Amendment. *See Benton v. Maryland*, 395 U.S. 784 (1969). The Double Jeopardy Clause embodies three separate guarantees: "It protects against a second prosecution for the same offense after acquittal, against a second prosecution for the same offense after conviction, and against multiple punishments for the same offense." *Justices*, 466 U.S. at 307–08. 1805 (citation and footnote omitted). "With respect to cumulative sentences imposed in a single trial, the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." *Missouri v. Hunter*, 459 U.S. 359, 366 (1983); *Whalen v. United States*, 445 U.S. 684, 689 (1980) ("The Double Jeopardy Clause at the very least precludes ... courts from imposing consecutive sentences unless authorized by [the legislature] to do so."); *Alberta v. United States*, 450 U.S. 333, 344 (1980) (stating, "the question of what punishments are constitutionally permissible is not different from the question of what punishment the Legislative Branch intended to be imposed. Where [the legislature] intended ... to impose multiple punishments, imposition of such sentence does not violate the Constitution.").

"Where the same conduct violates two statutory provisions, the first step in the double jeopardy analysis is to determine whether the legislature ... intended that each violation be a separate offense." *Garrett v. United States*, 471 U.S. 773, 778 (1985). Although the Double Jeopardy Clause does not flatly prohibit the legislature from punishing the same conduct under two different statutes, federal courts assume that the

legislature ordinarily does not intend to do so "'in the absence of a clear indication of contrary legislative intent.'" *Hunter*, 459 U.S. at 366 (quoting *Whalen*, 445 U.S. at 691–92); *see also Garrett*, 471 U.S. at 779 (holding that multiple punishments are permissible "when the legislative intent is clear from the face of the statute or the legislative history"); *Ohio v. Johnson*, 467 U.S. 493, 499 n.8 (1984) ("[I]f it is evident that a state legislature intended to authorize cumulative punishments, a court's inquiry is at an end." (emphasis added)).

If no clear intention is evident, the provisions are analyzed under the "same elements" test announced in *Blockburger v. United States*, 284 U.S. 299 (1932), which "inquires whether each offense contains an element not contained in the other; if not, they are the 'same offence' and double jeopardy bars additional punishment and successive prosecution." *United States v. Dixon*, 509 U.S. 688, 696 (1993). Notably although a federal court should decide under federal law whether a double jeopardy violation has occurred, it must accept the Florida courts' interpretation of the state's own statutes. *Hunter*, 459 U.S. at 368.

The language of the Florida criminal statutes defining robbery with a firearm and attempted felony murder in effect at the time of the offense does not contain a clear statement of whether the legislature intended to punish the same conduct under both of those statutes. *See* Fla. Stat. §§ 782.051 & 812.13. Therefore, the court will look to Florida's rules of statutory construction. Those rules provide, in relevant part:

775.021. Rules of construction

(1) The provisions of this code and offenses defined by other statutes shall be strictly construed; when the language is susceptible of differing constructions, it shall be construed most favorably to the accused.
....

(4)(a) Whoever, in the course of one criminal transaction or episode, commits an act or acts which constitute one or more separate criminal offenses, upon conviction and adjudication of guilt, shall be sentenced separately for each criminal offense; and the sentencing judge may order the sentences to be served concurrently or consecutively. For the purposes of this subsection, offenses are separate if each offense requires proof of an element that the other does not, without regard to the accusatory pleading or the proof adduced at trial.

(b) The intent of the Legislature is to convict and sentence for each criminal offense committed in the course of one criminal episode or transaction and not to allow the principle of lenity as set forth in subsection (1) to determine legislative intent. Exceptions to this rule of construction are:

> 1. Offenses which require identical elements of proof.
> 2. Offenses which are degrees of the same offense as provided by statute.
> 3. Offenses which are lesser offenses the statutory elements of which are subsumed by the greater offense.

Fla. Stat. § 775.021 (2007). Based upon this language, it is clear that the Florida Legislature expressly intended to convict and sentence a defendant for each offense he commits during the course of a single criminal episode, with three exceptions to that rule. *See* Fla. Stat. § 775.021(4)(b). The exceptions adopt the *Blockburger* test. *Longoria v. Fla. Dep't of Corr. Sec'y*, 5:16CV150/LAC/EMT, 2017 WL 7107455, at *12 (N.D. Fla. Dec. 28, 2017), *report and recommendation adopted*, 5:16CV150/LAC/EMT, 2018 WL 617754 (N.D. Fla. Jan. 29, 2018).

Petitioner has failed to show that the offenses in the instant case satisfy the first *Blockburger* exception, codified at Florida Statutes § 775.021(4)(b)1, because the offense of robbery with a firearm and the offense of felony murder do not contain identical elements of proof. The offense of robbery with a firearm has the following elements: (1) taking of money or other property, (2) from the person or custody of another, (3) with intent to either permanently or temporarily deprive the person or the owner of the money or other property, (4) when in the course of the taking there is the use of force, violence, assault, or putting in fear, and (5) when in the course of the robbery the offender carried a firearm or other deadly weapon. *See* Fla. Stat. § 812.13(1)–(2)(a). The offense of attempted felony murder is defined as: (1) perpetrating or attempting to perpetrate any felony enumerated in Fla. Stat. § 782.04(3) (which includes robbery, *see* § 782.04(3)(d)), and (2) committing, aiding, or abetting an intentional act that is not an essential element of the felony and that could, but does not, cause the death of another. *See* Fla. Stat. § 782.051(1).

By definition, the two statutes do not comprise identical elements of proof because felony murder in Florida requires an intentional act "that is not an essential element of the [underlying] felony." Such an intentional act is shooting the firearm, which is not required for robbery with a firearm. "Because each of the offenses of robbery with a firearm and attempted felony murder require proof of an element that was not an element of the other, the first *Blockburger* exception, codified at § 775.021(4)(b)1 does not apply to Petitioner's convictions or sentences for these

offenses." *Longoria v. Fla. Dep't of Corr. Sec'y*, 5:16CV150/LAC/EMT, 2017 WL 7107455, at *12 (holding in similar circumstances that felony-murder and robbery-with-a-firearm convictions based on the same occurrence do not violate Double Jeopardy). Furthermore, the second exception is not satisfied because neither crime is a degree of the other. Additionally, the third exception is not satisfied because robbery with a firearm is not a necessarily lesser included offense of attempted felony murder, or vice versa.

Therefore, any motion for judgment of acquittal based on Double Jeopardy for these offenses would have been rejected. An attorney cannot be deemed ineffective for failing to raise claims that are "reasonably considered to be without merit." *United States v. Nyhuis*, 211 F.3d 1340, 1344 (11th Cir. 2000). Petitioner is not entitled to habeas relief on this claim.

### C.    Ground Three: IATC for Failing to Move for Judgment of Acquittal on the Felony-Murder Count Arguing That the Shooting Occurred after the Underlying Felony, Robbery, Was Complete

Petitioner argues the shooting occurred while the victim fled after the alleged pizza robbery was completed. According to Petitioner, "to satisfy the second element of attempted first-degree felony murder, it is necessary that the intentional act be committed during either the commission, attempted commission, or during the escape from the immediate scene of the alleged crime". Here, because the shooting occurred after the robbery, it could not have been committed during the commission of the robbery. ECF Doc. 1 at 16.

In the state court's January 21, 2016, order denying the second amended 3.850 motion, the court applied *Strickland* and denied this claim because it was refuted by the evidence. ECF Doc. 47-22 at 107-08. Namely, "[t]he evidence showed that the shooter, identified by the victim as the Defendant, shot the gun into the vehicle occupied by the victim mere moments after the robbery and after the victim refused the shooter's demand for money. Even if the robbery was technically complete when the shots were fired, there was no break in the chain of circumstances beginning with the felony and ending with the shooting." *Id.*

As noted previously, counsel cannot be ineffective for not raising an argument that would be rejected by the trial court. *Chandler v. Moore*, 240 F.3d 907, 917 (11th Cir. 2001) (counsel is not ineffective for failing to raise a non-meritorious objection). Also, the Supreme Court "repeatedly has held that state courts are the ultimate expositors of state law[.]" *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975). "[S]tate law is what the state courts say it is." *Pinkney v. Sec'y, DOC*, 876 F.3d 1290, 1299 (11th Cir. 2017). Accordingly, "a state court's interpretation of state law . . . binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005).

The state court in this case cited *Wagner v. State*, 921 So. 2d 38 (Fla. 4th DCA 2006) and *Parker v. State*, 570 So. 2d 1048 (Fla. 1st DCA 1990). In *Wagner*, the DCA quoted *Parker* and held, "Absent some 'definitive break in the chain of circumstances beginning with the felony and ending with the killing, the felony, although technically complete, is said to continue to the time of the killing.'" *Wagner v. State*, 921 So. 2d

at 40–41 (quoting *Parker*, 570 So. 2d at 1051). The undersigned sees no reason to second-guess the state court's interpretation of state law and application of these cases to the facts of Petitioners case. Therefore, the undersigned agrees that any motion for judgment of acquittal raising Petitioner's argument in this ground would have been rejected based on Florida law, and Petitioner is not entitled to habeas relief on this claim.

   **D.    Ground Four: Petitioner's Sentence of 40 Years with a Mandatory Minimum of 25 Years for a Crime He Committed as a Juvenile Violates the Eighth Amendment**

   Petitioner argues the length of the sentence imposed upon him, when considering his youthful age, fails to provide Petitioner with a meaningful opportunity for early release based upon a demonstration of maturity and rehabilitation. He contends the sentence "constitutes a de facto life sentence" because he will be approximately 53 years old before he reenters society. Therefore, Petitioner concludes the sentence constitutes an illegal sentence under *Graham v. Florida*, 560 U.S. 48 (2010) (holding that the Eighth Amendment bars life without parole sentences for juvenile offenders who did not commit a homicide) and *Henry v. State*, 175 So.3d 675, 679-80 (2015) ("Because Henry's aggregate sentence, which totals ninety years and requires him to be imprisoned until he is at least nearly ninety-five years old" it does not afford him "meaningful opportunity to obtain future early release during [his] natural li[fe] based on [his] demonstrated maturity and rehabilitation", and so the sentence is unconstitutional under *Graham*).

As noted above, Petitioner's federal petition was stayed to allow the state courts to resolve this issue – in particular, to wait for the Florida Supreme Court's decision in *Pedroza v. State*, 291 So. 3d 541 (Fla. 2020), *cert. denied sub nom. Pedroza v. Fla.*, 141 S. Ct. 341 (2020). In *Pedroza*, the Florida Supreme Court held "that a juvenile offender's sentence does not implicate *Graham*, unless it meets the threshold requirement of being a life sentence or the functional equivalent of a life sentence." *Id.* at 548. In particular, the Florida Supreme Court upheld Pedroza's forty-year sentence for second degree murder imposed when she was seventeen because "she has not established that it is a life sentence or the functional equivalent of a life sentence." *Id.* at 549.

After the decision in *Pedroza*, the Florida Supreme Court accepted jurisdiction in Petitioner's case, quashed the First DCA decision in Case number 1D18-4684, and remanded the case to the First DCA for reconsideration. On remand, the First DCA affirmed Petitioner's judgment and conviction because "[u]nder *Pedroza*, a forty-year sentence is not a life sentence or its functional equivalent." *Kirkland v. State*, 312 So. 3d 1276 (Fla. 1st DCA 2021); ECF Doc. 47-32 at 2-3.

The state court's decision was not "contrary" to clearly established federal law or an unreasonable application of the law. The First DCA did not "arrive[] at a conclusion opposite to that reached by" the Supreme Court or decide a case differently than the Supreme Court when faced with a case involving materially indistinguishable facts. *Wellington v. Moore*, 314 F.3d 1256, 1260 (11th Cir. 2002). *Graham* and the

other cases relied upon by Petitioner dealt with life sentences, not sentences like those in the instant case and *Pedroza*. Petitioner can point to no U.S. Supreme Court precedent that clearly establishes that a forty-year sentence, with a 25-year mandatory minimum, is unconstitutional.

Finally, in Petitioner's reply he raises a new issue and argues he should be afforded a judicial review of his sentence pursuant to juvenile reform legislation that was passed in 2014. This was not an argument he raised in the petition. Petitioner cannot amend the petition through a reply. Petitioner is not entitled to habeas relief on this claim. *Hernandez v. Fla. Att'y Gen.,* 2019 WL 7284296, at *8 (M.D. Fla. Apr. 4, 2019) ("The Court need not consider the claims raised for the first time in Petitioner's Supplemental Reply brief."); *Gettis v. McNeil*, No. 3:08-CV-91 MCR EMT, 2010 WL 4342099, at *11 (N.D. Fla. Aug. 25, 2010), *report and recommendation adopted,* No. 3:08CV91 MCR EMT, 2010 WL 4282017 (N.D. Fla. Oct. 21, 2010) ("Petitioner could not amend his petition 'as a matter of course' by including an independent claim of ineffective assistance of counsel in his reply brief, because Respondent had already served its answer.")

## IV.    CONCLUSION

### A.    Evidentiary Hearing

The undersigned finds that an evidentiary hearing is not warranted. In deciding whether to grant an evidentiary hearing, this Court must consider "whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if

true, would entitle the applicant to federal habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). Additionally, this Court must take into account the deferential standards prescribed by § 2254. *See id.* Upon consideration, the undersigned finds that the claims in this case can be resolved without an evidentiary hearing. *See Schriro*, 550 U.S. at 474.

### B.    Certificate of Appealability

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides: "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." If a certificate is issued, "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." 28 U.S.C. § 2254 Rule 11(a). A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. 28 U.S.C. § 2254 Rule 11(b).

After review of the record, the Court finds no substantial showing of the denial of a constitutional right. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000) (explaining how to satisfy this showing) (citation omitted). Therefore, it is also recommended that the district court deny a certificate of appealability in its final order. The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." Rule 11(a), Rules Governing Section 2254 Cases. If there is an objection to this

recommendation by either party, that party may bring such argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully RECOMMENDED:

1.   That the petition under 28 U.S.C. § 2254, challenging the conviction in *State v. Kirkland*, 2008-CF-2150, in the First Judicial Circuit, in and for Escambia County, Florida, ECF Doc. 1, be DENIED without an evidentiary hearing.

2.   That a certificate of appealability be DENIED.

3.   That the clerk be directed to close the file.

At Pensacola, Florida, this 23rd day of March, 2022.

*/s/ Hope Thai Cannon*

**HOPE THAI CANNON**
**UNITED STATES MAGISTRATE JUDGE**

NOTICE TO THE PARTIES

Objections to these proposed findings and recommendations must be filed **within fourteen (14) days** of the date of the Report and Recommendation. Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control. An objecting party must serve a copy of its objections upon all other parties. A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.